On the Merits.
DAWKINS, J.
Plaintiffs seek to annul a certain mineral lease executed by them with defendant, on the ground of the alleged abandonment and failure to develop the leased property in accordance with the contract. They allege that defendant bored one well, passing through a gas stratum to salt water, which necessitated its abandonment; that a second well was drilled, which produced gas in paying quantities, and was completed about January, 1917; that defendant connected the same with its pipe line and paid petitioners for the gas for about two months, at the end of which time the said well was shut off from the pipe line, “although it contained a plentiful flow,” removed its machinei-y, and had. failed to prosecute any further development of the property for more than one year prior to the filing of this suit on February 11, 1918; that it had apparently abandoned the lease; and that since gas was discovered on petitioners’ property four gas wells had been drilled on adjoining lands, some within a stone’s throw of the line of petitioners, and gas was being removed therefrom and sold in great quantities, while defendant neglected to develop plaintiff’s property, notwithstanding th,ere was a ready sale at remunerative prices, for all gas that might be produced, to a pipe line passing through the neighborhood.
They pray that the lease be annulled and set aside save as to one well already drilled.
Defendant pleaded, first, the exception of *545 no cause of action, and, in the alternative, answered, admitting that it had attempted to drill no other wells. It further admitted the connection of the producing well with the pipe line, hut averred that it had been discontinued for the reason that, under the' contract, it had to furnish plaintiffs gas therefrom for domestic purposes, and that this so exhausted the supply of the well as to render its further connection with the .pipe line impracticable and unprofitable. It further' averred that no demand had been made for further drilling, and that “at the time [the drilling of additional wells] would be of no advantage to the same [property].”
There was judgment in favor of plaintiffs, annulling the lease, but reserving to defendant the rights of ingress and egress to the well producing gas, “for the purpose of using or selling gas from the same, should it so desire in the future. * * * ”
Defendant appeals.
Opinion.
The essential facts of this case do not appear to be disputed. Defendant commenced operations well within the terms of the contract, and bored its first well through the gas stratum to salt water, in an effort to find oil. The second well produced gas, but its exáet capacity is not given in the record. The general manager of defendant company referred to it a short while after completion as “a most excellent gas well,” but defendant did not show what the exact production was, although it must have had some record on this point. One of its employés testified that the well was small. On the other hand, a witness who had tested at least two of the four wells drilled near the property of plaintiffs on the north and northeast, testified that those wells had capacities ranging from 5,000,000 to 18,000,000 feet per day, with the larger wells nearer plaintiff’s property.
The pipe line was within a mile of the well in this case, and the evidence of defendant shows that there was a heavy demand for all the gas that could be had. In fact, the main excuse for not using the gas out of the well on the plaintiffs’ land was that after taking what was necessary for plaintiff’s domestic purposes the volume and pressure was so reduced that it could not- compete with the heavy pressure which was necessary to apply from the other wells flowing into the line to meet the demand in Shreveport, Little Sock, and other places.
There seems to be, therefore, no question but that there was an ample market for the gas which might have been produced upon plaintiffs’ property if reasonable development had been made; and it would also appear reasonably certain that if more wells had been bored there was more than a possibility that gas would have been found in paying quantities, in fact and within the meaning of the contract.
Hence we are called upon to determine the rights of the parties in the light of these circumstances and of the provisions of the contract, the pertinent portions of which, in view of their somewhat unusual nature, we quote, as follows:
“Know all men by these presents: That G. M. Hutchinson (vendee of Loran Frierson) E. Y. Frierson, Martha Irene Frierson, feme sole, and T. O. Frierson, of the parish of Gaddo, state of Louisiana, have and by these presents do hereby demise, let, and lease unto the Atlas Oil Company, a corporation under the laws of Illinois, herinafter s’tyled the ‘company’ its successors and assigns, the tract of land hereinafter described, for the' purpose of exploiting the same for and the production of minerals therefrom and also grant and convey all of the oil, gas, and other minerals in and under said lands, as also the exclusive right of drilling and operating thereon for oil or gas, together with a right of way for and a right to lay pipe lines to convey water, oil, and gas from the premises, to drill and operate any wells that it may bore, and also such other privileges as are reasonably requisite for the conduct of said .operations and the right to remove, at any time, from said premises, any and all property which *547 may have been placed thereon by said company. * * * [Italics by the court.]
“To have and to hold unto the said company, its successors and assigns, for the term and under the provisions as follows, to wit:
“First. There is hereby expressly granted to the said company the right at any time before the expiration of 12 months from this date to begin operations of drilling a well for oil or gas on said premises, and if such operations shall not be begun on or before the expiration of said 1 year from this date, then this lease shall wholly terminate.
“Second. If said company shall avail itself of the right herein granted and begin operations of drilling for a well on said premises, then from and after the beginning of such operations said company shall not be required to make any further money payments hereinunder; provided, however, if the said company shall begin such operations of drilling a well, but shall fail to prosecute such operations with reasonable diligence, then this lease shall become of no effect.
“If the company shall begin such operations of drilling a well within the fixed period from this date as above provided, or within any extension period for which it may have paid as above provided, then said company shall have the right to make as many attempts to find oil or gas as it pleases, and continue the exercise of such rights as long as it pleases, even beyond the said term of one year from this date; provided, only, such attempts shall be successive in the sense that until oil or gas be found not more than 60 days shall elapse between the cessation or abandonment of work on one well and the beginning of work on another.
“Third. If, in the exercise of the right hereby conferred, oil or gas be found in paying quantities on said land, then the company shall deliver as royalty to the said vendor one-eighth of all oil saved from wells producing 200 barrels per day or less one-sixth of all the oil produced and saved from any well in excess of 200 barrels per day, such delivery to be made either in tanks with connection by lessor provided or into any pipe line that may be connected with the well; and if any well on said leased premises produces gas in paying quantities, and such gas is used or marketed off the premises by said company, then the said vendors shall be paid at the rate of one-eighth the amount received for such gas, payment to be made on or before the 15th day of each month, for the gas sold in the preceding month.
“Fourth. If, as a result of any exploration under this contract, any other minerals than oil or gas shall be found in quantities deemed by the company to be paying, then it shall have the right to mine for and produce same, paying to the lessor what under all circumstances may be reasonable royalty.
“Fifth. It is expressly declared that if oil, gas, or other minerals, or any of them, be found in paying quantities, then the said company shall become at once vested with an estate in and to all of the minerals underlying said land, with right to produce same, and any and all of same, as long as any one of said minerals can be produced in paying quantities. * * *
“Seventh. If prior to the discovery of oil on said leased premise, and while this agreement shall be in force, there shall be drilled on adjacent property, and within 200 feet of any line of said leased premises, a well producing as much as 100 barrels of oil per day for 30 consecutive days, the company agrees that it will with all reasonable diligence begin and prosecute the drilling of a well on said premises in a faithful effort to find and produce therefrom oil in paying quantities.
“Eighth. It is agreed that unless drilling for 011 or gas be commenced on the tract of land this day leased by Mrs. W. X Hutchinson, widow of W. I. I-Iutchinson, Sr., Mrs. Mattie I-Iutchinson Robinson, wife of X M. Robinson, Miss M. B. I-Iutchinson, O. C. Hutchinson et al., to said Atlas Oil Company, within 60 days from the date of said lease, or upon the premises herein leased to said company within said period of 60 days, this lease shall wholly terminate and be of no effect, regardless of the conditions in paragraph -I herein, the understanding and agreement being that a well can be commenced within 60 days from this date on either of the tracts within 60 days of the completion or the abandonment of work on the first well, and that the beginning of such wells and prosecuting of the same with due diligence shall keep in force both leases for a period of 12 months: provided, however, should oil be found in paying quantities thereafter both leases are to be reasonably developed.
“Ninth. If in exploring for oil or gas under the tenns of this lease it be found that a gas well can be made, the Atlas Oil Company is to finish said well as a gas well and the vendors herein are to have the right to purchase the same from said Atlas Oil Company at the actual cost thereof, if said Atlas Oil Company shan desire to abandon the lease and to cease any further operations thereunder.
“Tenth. The vendors shall have sufficient gas for domestic purposes on said premises and operate two gins free of cost, provided gas be *549 found in sufficient quantities, said vendors to lay their own pipe line and make their own connections.
“It is further agreed that all the conditions and terms therein shall extend to the heirs, executors, legal representatives, successors and-assigns of the parties hereto. :
“The company has this day paid to the said vendors the sum of $2,355, the receipt whereof is hereby acknowledged, and which payment is received in full satisfaction of any and every right hereby granted, including the right to extend the privilege of explorations of said land.”
It will be noted that, contrary to the usual provision for the payment of a yearly rental to keep the contract alive, on failure to drill, after the expiration of the first period of one year, the contract in this case stipulates for continuous drilling, at intervals of not more than 60 days fronj the completion of each dry hole, until oil or gas is found in paying quantities; the contract expressly providing that the failure to begin before the expiration of the year should cause the lease to “wholly terminate.” No proviso follows, and there is nothing said about the payment of rentals, although in the concluding paragraph, wherein acknowledgment of the reaeipt of the price of $2,355 is made, it is said, “and which payment is received in full satisfaction of any and every right hereby granted, including the right to extend the privilege of explorations of said land.” We take it that this last clause meant such extension as might be subsequently agreed upon. The parties evidently so interpreted it, as will be seen from the following letter from the general manager of defendant company to one of the plaintiffs, written with regard to operations upon a tract covered by another lease, but which was almost identical with the one under consideration, and so interwoven together as to, in very many respects, constitute one undertaking:
“March 12, 1917.
“Mr. T. S. Hutchinson, 1725 Fairfield Avenue, Shreveport, La — Dear Mr. Hutchinson: The time is very rapidly approaching when, under the terms of our lease from you and the other members of your family, we must begin drilling on the lower parcel of property embraced in the lease. I am writing to ask you upon your part to grant and to procure for us from the others interested an extension in the drilling requirements on this property. I think you know that we had thoroughly tested what we call our Frierson lease, that is the northern parcel of land under lease from you and your family, in all of the sands heretofore explored by the oil companies, we Went back into that well and spent more than $5,000 in exploring the deeper sands, without any favorable results, however, in the matter of locating oil. We then drilled a most excellent gas well in the shallow sand. [Italics by the court.]
“I think you also know that we are now engaged in constructing an eight-inch pipe line for gas from the Shreveport to the Bossier field, and on account of the fact that in the Frierson well we found gas in paying quantities in all three of the sands, we are building that pipe line down the western side of the river, and will cross the river very near this Frierson lease. This will give to you a market for your gas and will make the property profitable. The creation of this market for your gas is costing us many thousands of dollars.
“We have very little idea that any oil will be found on the lower tract which we have under lease. We do believe, however, that some portions of that land will be found valuable for gas. There can be no possible advantage gained in drilling on that lease for gas until there is first a market for it. Just as soon as the market is ready, we will do the necessary drilling and test this property for gas and oil both. Since, therefore, it cannot possibly work to your disadvantage in any way and will work to our very great advantage, I am writing to ask if you will give us an extension of this lease so that we will not be required to drill until on or before the 15th day of June. I sincerely trust that you may see your way clear to grant this concession.
“Please let us have your reply as early as possible, lor if you do not see your way dear to grant this request we must take the necessary stops to protect our lease which we already have. This, however, will give us considerable convenience.
“Very truly yours, O. A. Wright.”
The lease on the other tract (referred to in this letter) expired May 8, 1917, and the extension was granted in accordance with this request until August 1st, in consideration of *551 defendant’s agreeing to either drill upon that tract in the meantime or to pipe gas to plaintiff’s plantation from the well which had been bored upon the tract now in contest. The pipe was laid and connection made in compliance with the latter condition, at a cost of som'e $4,000 to defendant. As will be noted from the date of the letter quoted, this all took place after drilling was stopped on the property here involved, and had reference to the other tract, which is not covered by this litigation. However, as appears from the eighth paragraph of the lease quoted above, the beginning and prosecution of drilling upon either tract, as therein provided, was to keep in force the rights on both.
It is also significant, as indicating the intention and purpose of the parties, that the said paragraph 8 provides that “should oil be found in paying quantities, thereafter both leases are to be reasonably developed.” And, again, it is provided in the following paragraph (9) that if a gas well “can be made” plaintiffs were to have tire right to purchase 'same at actual cost “if the Atlas Oil Company shall desire to abandon the lease and to cease any further operations thereunder.”
These matters are referred to for the purpose of showing that, at the time of making the contract, it was evidently the main desire of defendant to explore for oil, and that if gas alone was found it could abandon the lease, and in that event sell the well to plaintiffs at actual cost.
As a matter of fact, it had removed its machinery and made no further effort to1 drill on the land for more than a year prior to the filing of this suit, and under a reasonable Interpretation, both as a matter of fact and of law, had abandoned the lease, although such purpose had not been affirmatively communicated to the plaintiffs. This view finds considerable support in the fact that, in addition to the circumstances detailed above, the defendant had cut the well off from the pipe line, and had permitted plaintiffs to use its output for domestic purposes, with the exception of a negligible quantity which was being consumed by one ICnight.
Counsel for defendant quote in the brief and rely upon the fifth paragraph of the lease as giving it a vested right in all the gas beneath the premises.
For the purpose of discussion, we again quote that stipulation:
“It is expressly declared that if oil, gas, or other minerals, or any of them, be found in paying quantities, then the said company shah become at once vested with' an estate in and to all of the minerals underlying said land, with right to produce same, and any and all of same, as long as any one of said minerals can be produced in paying quantities.”
This provision was unquestionably intended to give the defendant the right to develop the land and to derive ail óf the benefits which that development afforded, so long as the operations were profitable. At the same time, the contract was commutative in its nature, and the right or privilege mentioned carried with it the implied correlative promise to plaintiffs that it would prosecute the development with sufficient thoroughness to produce at least reasonable benefits to the lessors. The main object of this and all other mineral leases is to have exploitation of the premises for their minerals, and, if found, to have them produced for the common benefit of the lessor and lessee. Hence, universally, a comparatively short time is stipulated within which operations shall be commenced, and in default provision made for delay, upon the payment of a satisfactory consideration; and after the mineral is found it is equally uniformly provided that no further payments shall be made. Why? Because it is intended, sometimes- expressed, but we think in all cases implied, that the minerals will be produced and marketed to the best advantage of both parties, especially where, as in the present case, there is a *553 ready and easily accessible market for all that can be had.
[2] In our opinion it would require a very clear and unmistakable contract to support the proposition that a lessee could, after discovering any mineral in paying quantities, decline to explore further, refuse to pay any further consideration, and fail to market that which had been found, indefinitely and at his pleasure. Such a situation would be, to say the least, contrary to the principles of equity, to say nothing of a' wholesome public policy which frowns upon such putting of property out of commerce.
Then, again, it is clear that in the case of oil and gas a different rule to that of other minerals, ex necessitate, must apply because of the peculiar nature of those substances, and of the law applicable thereto, which enables the owner or lessee of adjoining tracts to extract all that can be drawn from the earth through his own property, including that which lies under his neighbors. Hence time and prompt development become of the essence of such contracts, once oil or gas has been found. , Archer on Oil & Gas, p. 6, § 1, and paragraphs 438 and 444; Guffey Petroleum Co. v. Oliver (Tex. Civ. App.) 79 S. W. 884; Green et al. v. Standard Oil Co.. 146 La. 935, 84 South. 211.
For the reasons assigned, the .judgment appealed from is affirmed, with costs.
O’NIELL, J., concurs in the decree.